We have today the Tennecum Township versus United States Department of Transportation Etal, City of Philadelphia. Ms. Lichtman. Good afternoon, Your Honors. Barbara Lichtman, four petitioners. I would like to and would appreciate the ability to reserve five minutes of my ten-minute presentation. Thank you. I'd like to dispose of one issue at the outset, and that is the April 26th letter submitted by the respondents because, well, two reasons. One, it is a post hoc rationalization submitted after the administrative record was complete, four months and two months after this litigation commenced. Third, it contains nothing but proof that the respondents had not done their analysis correctly in the first instance. If that's true, why wouldn't you want it in the record, if it's great for you? I was going to give this court the option under, our suggestion would be, one, take it out because if you take it out, then all that remains is the EPA opinion, which we believe should be accorded deference because of its special expertise in the area of air quality analysis. All that remains for the court to look at is the consistent opinion of the EPA that this analysis during the NEPA process was not correctly done. But if the court should choose to accept the April 26th letter into the record, that works for petitioners, too, because it's the best evidence that there should be a supplemental environmental impact statement created. Because that let's... Can I ask you something about your underlying assumption there? When you say that if it's out of the record, that's game up, because then it's the EPA versus the FAA, and the EPA is the one that gets deference. How do you respond to decisions like the D.C. Circuit's Olmstead opinion that seem to be saying that the FAA, as the agency responsible, is the one to whom we are to give deference on the factual determination about whether or not emissions are going to comply with the standards of the Clean Air Act? Your Honor knows how to hurt a girl, because I was the attorney for the City of Olmstead Falls in that case. The difference here is very important. In that case, we did not have the support, we did not have a comment by the Environmental Protection Agency concerning the inadequacy of the analysis created by the FAA. In that case, we had our independent individual consultants. In other words, it was a battle of the experts according to the court. And that, of course, is not permissible. But even if that's true, I guess I'm asking a purely legal question here, or at least I'm trying to. It's the FAA, I mean, not the EPA, the FAA that's got the responsibility to make the determination, right? That's right. I mean, it's supposed to solicit the views of the EPA, and it does that, but Olmstead seems to say, and the law seems to indicate, help me if I'm wrong, that the responsibility is borne by the agency that's making the environmental impact statement to make a judgment about the Clean Air Act, right? No. Two issues here. One is that the agency, in the case of making a determination about conformity, the conformity rule, that's correct. It is the responsibility of the agency making the determination, in this case the FAA. This is not a case about the conformity rule. Olmstead Falls was. This is not an allegation that they didn't, the respondents didn't comply with the conformity rule. We don't know because we don't have sufficient information in the record to determine if they did or they didn't comply, and the reason we know we don't have sufficient information in the record to make that determination, nor are we going there, is because the EPA says that the modeling and the analysis was patently deficient. So you're disclaiming, and I guess your reply brief could be read this way, you're disclaiming any attack on the CAP based on the Clean Air Act. You're strictly saying under the NEPA there's a problem. Is that correct? Correct, Your Honor. That is correct. All right. And if that's true, if that's true, then what's wrong with the FAA making a determination as it did on each of the categories involved with the Clean Air Act and saying we've answered your questions, EPA, and we're comfortable with what we've done. What's arbitrary or irrational about that? Because the EPA, which is the agency delegated by the Congress with authority to make determinations about what is and what is not conforming to a correct analysis of air quality emissions, and this circuit has found that deference follows delegation in Chau v. Community Trust. In the other cases that you've read, in fact, every other case cited, the question is whether or not the agency making the determination in that case concerning the NEPA adequacy was the agency which was delegated by Congress with and should receive deference by virtue of that delegation. This is the only case that exists that I know of where an agency delegated by Congress to make these determinations has taken a firm and consistent position that the analysis was wrong. If I may, Your Honor, indulge me. I've got one last question on this line. Certainly. If that's ... The law sets up the Council on Environmental Quality specifically to take account of disputes between agencies, right? Okay. And EPA doesn't make any reference or doesn't do anything to refer this matter to the Council on Environmental Quality, which I think indicates that they don't find the CEP to be environmentally unsatisfactory. Correct? No. Your Honor. So the fact that there is a mechanism established in law for handling a disagreement and EPA chooses not to go there, that should mean nothing to us in reviewing what's occurred? If you take it in the framework of the actual law and the facts, no, it shouldn't. Here's why. Because? The reference ... First of all, CEQ was established to promulgate regulations. It wasn't established for the express purpose of adjudication of these claims, but putting that aside ... Isn't that where it would go? I mean, if EPA really had a problem here and said, FAA, you have totally bollocked this, and FAA was adamant and said, no, we have it, is the Council on Environmental Quality where that would be referred? If the disagreement is totally intractable ... That's my hypothetical to you. Within 25 days ... Yeah, sure. Within 25 days after the final environmental impact statement is issued to the public, the EPA has to send this to the Council on Environmental Quality. Now, in this case, the EPA and the FAA were still discussing this issue long after the deadline and the statute says you cannot send it to the Council on Environmental Quality any time after the 25th day after the issuance of the final environmental impact statement. But the record was still open until the publication of the ROD, the Record of Decision, and the EPA used that opportunity to try and work with the FAA to try and accomplish a resolution of their differences. They missed the deadline. They still rated the project EC2, which was Environmental Concerns Level 2, which meant that there wasn't sufficient information in the record to determine if the air quality analysis was, in fact, correctly done. And that's what we're saying. It is totally in conformance with our position. EPA was barred from going to the CEQ? After 25 days after the issuance ... No, no, no, before that. Even though they were negotiating, were they barred or were there discussions? No, they weren't barred. What isn't that? I'm just trying to get flesh out the judge. They weren't waived at that point then? Pardon me? I mean, if they haven't gone in the 25 days, sounds like they didn't think it was a big enough issue to go. No, I would disagree with you, Your Honor, and you know what I would think would be the most important evidence of that? The April 26th ... Well, first I would start with the December 28th, 2010 comments in which they said, we're sticking with our old comments. This isn't going to work. You didn't do a credible analysis. Subsequent to that, the FAA did two studies, which haven't been submitted to the public, have no idea what they said or whether they're credible, and there was a subsequent letter allegedly to draw back their criticisms, but the bottom line here is that the failure to submit to the CEQ is beside the point. If you're still two agencies talking to each other, hoping to reach a resolution, you've got to do it after 25 days. We're almost back to where we began at the beginning of the discussion. It sounds like by the April 26th letter that the EPA was essentially caving on a couple of issues and was deciding that it just wasn't a big enough case on the other issues for them to make a big squawk about it. I mean, let's just run through. I think there's about six items that you are saying that there was a problem. Let's take, for example, the construction emissions and that there should have been dispersion modeling. But what are the threshold levels for there to be a requirement that you do dispersion modeling? You mean, is there a number? Yeah. That would be a case-specific issue, Your Honor. But it looks to me like the projected emissions are below the threshold levels here. According to the EPA, and I'm not going to put myself in the shoes of the EPA, according to the EPA, we can't even know whether, in fact, those emissions were below de minimis unless they did modeling instead of just an inventory on construction emissions. And even more important, this was a 12-year-long construction project as opposed to the normal construction, which can be three or four. The only thing that I saw that they had a problem with were the VOCs, years, what, five and six. Well, those aren't even pollutants, are they? They're precursors. The precursors, yes. They're precursors, but they're still criteria pollutant that have to be properly analyzed to determine conformity. And according to the EPA, they didn't. And the EPA is the agency, not me, not this Court. We can't put ourselves in the shoes of a technical specialist like the EPA with deference, charged by Congress to make these determinations. Could you explain the deference argument again? I'm not sure that I follow it. Are you saying the EPA comments are entitled to Chevron deference? Chevron deference, Your Honor. The comments. Because this Court has held consistently that the agency delegated by Congress with the power to make and enforce regulations is the agency entitled to deference. What is entitled to deference? Pardon me? What is entitled to deference? Their opinion in the area of their special expertise. Interpreting statutes or guidelines? Interpreting statutes, interpreting guidelines, and determining whether or not an action by another agency has complied with those statutes or guidelines. Making recommendations to another agency? Your Honor is characterizing these. I would respectfully disagree with that. I know. And you're characterizing it the other way, so I'm trying to find out where it stands here. I know. I know. You're a very good advocate. Thank you. In my humble opinion, this is not a recommendation. This was a statement of educated expertise. You haven't done it. It's an opinion. It's an opinion letter, right? And they were expressing a preference, but they weren't even concerned enough to elevate it to the CEQ. In fact, Your Honor, I don't, and I may have missed a case, but I haven't seen very many cases in which these have been elevated to the CEQ, number one. Number two, these agencies were trying to hammer it out, and I give them a lot of credit for doing that, but they were not able to do that. And at that point, the EPA's opinion became definitive. I guess I have two problems with that. First, when you say they weren't able to do that, isn't the April 26th letter, in fact, the evidence that they were able to do that, that the EPA says to them repeatedly, well, you know what? We accept what you've done here. Maybe in the future, you'd like to try what we're thinking, but we're satisfied with this. Isn't that what they say on virtually every point that you've laid out? They've got this sort of a we're okay with it response, right? Your Honor, if you don't mind my using a colloquialism, the letter was what we call CYA. Okay. Even if that's true, when you say they weren't able to work it out, shouldn't we, whether you question the motives, I mean, there is a fact, a letter that exists, which indicates they did work it out. Actually they didn't. If you read the text of the letter very carefully, you will see that there was still substantial disagreement. In those portions where the EPA said, we will defer to the guidance promulgated by the FAA, please remember that the FAA's orders are not entitled to deference, number one. Number two, they also said, very cannily, do it better next time. We'll be okay this time. Do it better next time. That doesn't mean they accepted it. That means they were willing to go along with it for reasons you and I cannot know. Okay. Well, then I guess you'd agree, although you're not happy with it, that they did work it out. No. At least as to this project. They never worked out. They say, we'll go along with it. What does that mean? That means that they were willing to politically agree, but that in their expertise, they were still wrong. But here's the problem, Your Honor, NEPA says the public has the right to review and comment on agency decisions. That letter was based on two studies we've never seen, you've never seen. We don't know whether they were right or wrong. We can't evaluate them. So whatever agreement may have been reached, and I would submit to you respectfully, there wasn't agreement. There was abdication. We can't know now, nor is this compliant with, doesn't make this compliant with NEPA because nobody has seen or been able to review and comment on these studies, or on this letter for that matter. If that's, if we should take it out and just ignore the April 26th letter, can you give us a little bit more on Judge Sirica's question about deference? We have precedent in our circuit and relying on Christensen v. Harris County that says it's not appropriate to give deference to policy statements or enforcement guidelines or opinion letters. How is this commentary, which evidently is coming from one person within the EPA, going over and commenting for the FAA? How is it that that should attain the status of official rulemaking and therefore be given Chevron kind of deference? Well, Chevron deference is not limited. The cases don't say that Chevron deference needs to be limited to rulemaking. It is interesting, however, that the cases, as I mentioned earlier, the cases deal with never by an agency that would normally get deference. Now, that's one issue. The second, and this is what this Court has said in Chalvie Community Trust, 2007, we do not generally accord deference to one agency's interpretation of a regulation issued and administered by another agency. Meaning, if you read one agency's interpretation, meaning the FAA's interpretation of a regulation issued and administered by the EPA. We do not give deference. I understand what you're saying, but I don't think you're answering the question I'm trying to ask. I'm sorry. Which is, in this exchange of letters, it occurred to me, and maybe you can help me understand why I'm mistaken in this, that what the EPA was doing was akin to, perhaps, an opinion letter at most. It was giving some reflection, a response to the FAA and saying, this is what you're saying, this is how we see it. If we've got precedent that says directly, well, we don't give Chevron deference to agency statements that are contained in that kind of correspondence. Why should we give it in these circumstances? How is this a different circumstance than an opinion letter or a policy statement or a manual from an agency or an enforcement guideline? How is this different? Understood. Because in this case, the EPA was depending for its opinion on the Guideline on Air Quality Models. The Guideline on Air Quality Models was a regulation with the force of law delegated to EPA, promulgated by EPA, and enacted in the normal notice and comment period in the Federal Register. And if I may, the EPA said, the methodology used to estimate the maximum 2.5 concentration does not follow proper guidance for modeling impact on the National Ambient Air Quality Standards. The proper guidance can be found in the Guideline on Air Quality Models 40 CFR Part 51. Not only that, but the FAA repeated times agreed to follow the guidance set forth in the Air Quality – in the Guidance on Air Quality Models and didn't do it. Therefore – You can certainly look at this correspondence and ask yourself why these people don't pick up the phone and talk to each other. I'll grant you that. I mean, there's ample opportunity to look at some of these exchanges and get the sense that they're speaking past each other. But I'm still not sure that I understand, but I think I get your answer. I'm not sure I fully grasp what you're relying on as legal authority, but I think I understand your answer that we should give deference to this because it's the EPA and they're the ones that administered NEPA and the Clean Air Act. And they're interpreting it – I'm sorry. That's the bottom line, right? Because they're the ones that are generally doing this, so we've got to defer to them in a Chevron style. One more point, and that is the one I just made, and that is because during the course of this conversation, they were using as a basis for at least part of their commentary the GAQM, which was their regulation, which they are entitled to interpret, and which the FAA is not entitled to interpret under your standards of deference. And the FAA agreed on numerous occasions, and I can cite to you in the DA, and we did in our briefs in the deferred appendix, where the FAA agreed to follow the GAQM, but apparently did not. Good. Thank you very much, Ms. Litt. Thank you for having me. We'll have you back. We will. Mr. McFadden. Thank you, Your Honor. Good afternoon. And may it please the Court, Elaine McFadden for the United States. I'll be sharing four minutes of my time with counsel for the City of Philadelphia. I suppose I'll begin with the question of the standard of review and the proper amount of deference. Due to the various statements in this record, as it was most of the petitioner's argument, the petitioner's approach in this case has combined two very distinct theories of deference. There is the Chevron theory of deference, which has to do with the Congress's delegation of authority under a statute that it enacts to a particular agency to implement that statute. And that is what Christensen, as Judge Jordan asked about, has to do with whether policy statements amount to an interpretation of regulations that courts should defer to. All of that has nothing to do with this case. This case is about a very distinct type of deference, which is the type of deference that courts grant to the experts at an executive branch agency who are making technical and scientific determinations. And that type of deference arises in NEPA evaluations precisely because there is not a statutory interpretation presented. There is no de novo question of law. There is instead, as this Court said in Concerned Citizens Alliance v. Slater, a pragmatic decision to be made by this Court about whether the EIS, taken as a whole, informed decision-making and provided for public participation. One of the questions only is that when the EPA on, I guess, at least three different occasions writes letters saying that we've got a problem, pick one example, dispersion modeling. Why didn't the FAA just perform additional dispersion modeling? Well, Your Honor, the FAA explained that in some of its responses. They're different depending on which aspect of the project was to be dispersed and modeled. The answer, the overarching answer to all of those, is that it was not required by any law or statute or guidance, either by EPA or FAA. EPA had suggested here that it would... I understand what you're saying. And I ask the question of your opposing counsel saying that, you know, there arguably were not the thresholds met for the dispersion modeling to be done. But nonetheless, when somebody's saying to you once, twice, three times, I've got problems, why not just try to bat the ball out of the air? I mean, she is correct. When you look at the EPA letters and then compare it to the final one, it's like somebody either had an epiphany or something else happened prior to April 26. Well, Your Honor, if you look at that exchange of correspondence in late 2010 going to April 26, and then compare it to the correspondence between the agencies in 2005 and 2006, when all of these approaches were being developed and discussed and collaboratively agreed, there was a protocol in place that was developed in conjunction with the EPA, EPA submitted comments in the draft protocol, FAA refined the protocol in response, and then it used that protocol because EPA never submitted a single comment on the final protocol. All of that exchange and all of that correspondence raised none of the issues which petitioners now present to the court as described as EPA's considered objections. What I'm saying to you is a more basic question. EPA presented concerns on more than one occasion. And wouldn't the easy thing to do or to have done would be to do additional testing with regard to each of these particular points, whether it be dispersion modeling, whether it be building downwash, the mobile source emissions, the upgaging issue, and, you know, who sets the plan for what's reasonably consistent? Well, we'll deal with that. Let's deal with those five. Why don't they just – wouldn't that be the easy thing to do? No, Your Honor. It's actually not easy at all. To conduct dispersion modeling is a time and labor-intensive process. If you look at DA 702, they described that the models they did run had 5,000 independent inputs, each of which interact with each other, and each additional input that you add to the model increases the time and effort that is required to run it. It also increases the layer of assumption on assumption that is built into the model. So you're still getting estimates. It isn't as if FAA could have gotten the definitive certain answer and simply refused to press the button on the program. It's far more complicated than that. And there were a number of issues where EPA suggested refinements to the NEPA analysis and FAA agreed to do them. Well – They didn't on these points, though, right? That's right. I'd still be arguing about these five matters if there had been an agreement on them, but these are things which there was a back-and-forth, and at least as of December 28, 2010, the EPA was still saying – in fact, the December 28th letter kept saying over and over again, look, you're just saying the same thing over again, FAA. We pointed out the problem with your modeling, the failures of your modeling, and instead of responding and saying why your reasoning works better, you're just repeating again the earlier analysis, which we have already pointed out the flaws in. That's the tenor of the December 28 correspondence. So if EPA says, for example, with regard to the particular matter issue, you've got to give actual modeling for the background sources and put that in the mix or you won't get an accurate model, and FAA says, no, you don't, because it's going to stay the same, and the EPA says, no, good modeling requires you to do this, you can do it, you should do it, and they just say, no, you don't, because it's going to stay the same, I mean, how is that – how is that – Constructive engagement. Yeah. It's just – it seems like, you know, one can sort of feel the EPA person's pain, like you're just not responding to me. So that your response, that that's hard to do, is that a legally relevant response, or should we be paying attention to what EPA says when they say, good modeling requires you to do this? Whether it's hard for you or not, that's what's required. Well, whether it's hard to do is, in fact, a legally relevant response, because it goes to whether the EIS has done enough to provide information, but let me answer your real question, which is whether FAA was being recalcitrant and not actually responding to EPA's results. You see the chart towards the end of the deferred appendix that lists EPA's comments on the final EIS, and then further EPA comments in that last couple of days of December. The FAA draft responses that they're responding to are sort of missing from that chart, and that's regrettable, because FAA said a good deal more than, no, we don't, it won't stay the same. To address that specific question, which is about nearby stationary sources off the airport site, there's a number of explanations for why the approach actually did account for very conservative estimates of those concentrations, and I'm happy to talk in some detail if the court has specific questions, but I don't want the court to come away with the idea that FAA simply refused to do these things because it was not the way that things had been done in the past. There are reasons given in the record for each of these specific requests, and those reasons are what this court has to look at to determine whether or not FAA had responded reasonably to EPA's response, because that is the CEQ requirement. Why don't you take us through that? Certainly. Okay. We'll start with nearby stationary sources, which is the question Judge Shorten raised. There, again, this, the way that these were addressed in the background values was devised in the protocol with EPA several years before. It then addressed, it included the values in the concentrations that were calculated in the dispersion modeling by taking a very conservative estimate of the peak days and peak hours of emissions from those plants, and then added those to the modeled emissions at the various points where the models were done on the airport site. So you've got a worst case scenario for each of the points that were modeled based on the emissions from those other plants. The fact that the emissions from those other facilities wouldn't change between the alternatives is highly relevant in a NEPA context, or it may not be a Clean Air Act answer, because the whole purpose of NEPA is to guide the agency's choice between those alternatives. Which of these alternatives will be environmentally preferred, and which of these will ultimately be the one that is selected by the agency? And the fact is that dispersion modeling on that point of those emissions, which were not affected in any way by the project, would have been the same and would not have affected that choice because the incremental difference would have been identical. So that takes us sort of to the deference question again. If we're talking about what NEPA requires and what it doesn't require, and we have EPA weighing in and saying, this is the right way to handle modeling and what you're doing is not the right way. And let me just add on to that, and the EPA is the expert in this area. EPA is an expert in this area. It is not true that EPA has delegated the authority to administer NEPA, as was earlier suggested. They are delegated the authority to administer the Clean Air Act, but violations of the Clean Air Act are not before you today. The EPA has, of course, enormous expertise in air quality, but the FAA also has expertise in air quality, especially as it relates to mobile sources and transportation, which is the FAA's area of expertise. So what's the answer to the question we were batting around with Ms. Lishman about deference? Do we give, should we be paying attention to what the EPA says when they say, this is just bad science. And then the FAA says, no, we're not, and the EPA says, yeah, you are, and then magically on April 26th they say, well, okay, but we continue to recommend that on future projects you do it like we're telling you because that's the good science. I mean, where we have two agencies purporting to have expertise telling us different things, who are we supposed to defer to in a NEPA challenge? Here's the answer to that question. As all the other courts have held when confronted with this issue, and you can look at page 26 of our brief, has cases from the D.C. Circuit, Ninth Circuit, and Fourth Circuit, all where an agency's EIS was challenged because some other expert agency had negative comments. Courts have uniformly said, you don't engage in that battle as a reviewing court. You instead ask what this court has described as the pragmatic question. Did the agency comply with the CEQ requirements in responding to those comments from the other agency? Did it give reasons in its response? And does the document as a whole provide enough opportunity for informed decision making that it upholds the entire project on which relies on this NEPA document? And there is no reason, and there's certainly no cost to approach this this way, for the court to have to identify line by line which agency's approach it preferred and which was the better approach. The question is whether the FAA's response was adequate. Did it give a reason to support its decision? And then did its decision in the Record of Decision to approve this project, was it based on an EIS that provided for public participation in decision making? And that overall question must certainly be made in the FAA's favor. I've reserved the rest of my time for my counsel. No, I don't think you're finished yet. And what about the letters post Record of Decision, EPA letters? Why should we consider that? You only need to look at that letter if you were to agree with petitioners that there is some new NEPA standard of review where on air quality questions, EPA comments are correct as a matter of law. But first, are we allowed to even look at them, even if we wanted to? Well, this is the problem, right? Of course, generally the answer would be no. In all other NEPA challenges, it's brought by the EPA, it's an arbitrary capricious standard, it's based on the Record of Decision and the record that precedes that, and you don't look at extra record evidence. The letter was submitted because the question was raised about what EPA's final views were, and those are the EPA's final views, not the draft views. So if this court were to introduce a standard that required it to ask what the other agency's final views were, and to give them some unspecified weight, then you would need that letter to do it. That's the inappropriate standard. The appropriate standard is in the Administrative Procedure Act. You ignore the letter, and you give the EPA's comments some weight, just as you would any public comment in the document, where someone has submitted a comment that says there is a problem with your EIS and I wish you'd reconsider. And the way you review that is the way all NEPA documents are reviewed, which is to ask whether the deciding agency responded in a reasonable fashion and gave an explanation for why it did what it did. Even after the Record of Decision? No, no, as of, at the Record of Decision. My suggestion is you do not adopt the standard that they have invented, which no court has adopted. You instead apply the Administrative Procedure Act, then you don't need the April 26th letter because there is no rule that the EPA's views are preferred over the FAA's or vice versa. What about the argument that just having these supplemental letters means that we should have a supplemental EIS? Well, it doesn't rise to the standard established either in the CEQ's regulations or in the FAA's own guidance, which says that you would have to paint a totally different picture of what the environmental impacts are overall, right, let alone just air quality, in order to require supplementation of the EIS. Here there were a couple of extra analysis that were done, it was suggested that no one seen them, but we did file them with the court and serve them on petitioners. And they were completely consistent with what FAA had been saying throughout the process. They further reconfirmed things that were already confirmed in the EIS, the Air Quality Technical Report, the Conformity Determination, the Delaware Valley Regional Planning Commission's own transportation plan. All of these findings, backed up by hundreds of pages of analysis, all come out exactly the same way. And they all conclude that the air quality impacts will be de minimis, there's no health impacts that are identified, and that the air quality impacts give no reason not to have decided to approve the project overall. Can I ask a question on another topic? Of course. And maybe this is one that's better directed at your co-counsel, but would you respond to the assertion that it's just, it's incorrect for the FAA to treat the DVRPC as the relevant public agency when it comes to considering the decision under the Airport and Airway Improvement Act? Yes, of course. The AAIA, sorry, AAIA, I always do that, requires that it find the plans be consistent with the plans of the public agency authorized by the state to plan for development of the area. Right, it formerly said reasonably consistent, now says consistent, that's all the same thing. The relevant clause is the public agency authorized to plan for development of the area around the airport. And that, in this particular case, is the Delaware Valley Regional Planning Commission. It's the Metropolitan Planning Organization, which the AAIA emphasizes is the key regional planning agency set up. An MPO, as that's known, has to be set up for any area where there's 50,000 or more people. The statute contemplates that that's who you would look to. They are authorized to develop plans for the entire Delaware Valley region. The Township of Tentacombe, as it is pointed out, of course, has zoning authority and planning authority within its own borders, to be sure. But that does not encompass the area around the entire airport. They have some authority over some portion of one corner of the airport, and the broader plans are planned, created by the DVRPC. And so... Delaware County would fall in the same category as Tentacombe? That's correct, yes. That's correct. And Delaware County, I should point out, though they're petitioners today, has a seat on the DVRPC and is an active participant in that Regional Planning Commission. But speaking independently, their view is one that is not consistent with the seat, correct? Well, they have said that in their brief, that they've never identified their plans and why those plans are inconsistent with the airport. We have nothing in the brief to suggest what the inconsistency is. Tentacombe, likewise, has not identified its plans, although it has said that you should be able to tell from its face it's inconsistent with its plans, because the project will relocate homes and businesses. And that, of course, isn't a rule that we could take as a matter of law. We could not rule that it is facially inconsistent, because that's the fact. But let's assume that they're right, that that's inconsistent with their plans. They are still not the public agency authorized by the state to plan for the area around the and the DVRPC is. I'm happy to answer further questions about that. I mean, there are a number of cases. I think the Eighth Circuit's opinion in the City of Bridgeton is very good on this point, that, you know, it's not at all uncommon that a neighboring municipality dislikes an airport expansion project. And as the House report and the enactment of the original version of this consistency provision identified, we never want to be in the case where we allow a neighboring municipality to have a veto over the project. If it's inconsistent with their plans, we want to identify the Regional Planning Commission that considers the overall area and make sure their plans are the ones that we're consistent with. And that is what the FAA found was true here. Thank you very much, Mr. McFadden. Mr. Pills. Good afternoon. Thank you, Your Honor. Eric Pills for the City of Philadelphia. Let me start where we left off and just add that in the compact creating the DVRPC, Article III, Section 2, and this is in our addendum at page 165, it's very clear that it, the commission, shall initiate and develop surveys and plans of a regional nature. When you skip down in the same paragraph, it shall be the function and duty of the commission to make a master plan and such survey and studies as may be essential thereto for the physical development of the area and submit said plan to the participating governmental bodies. As counsel for FAA pointed out, there may be overlapping spheres of plans, of planning, but there's no question that the DVRPC is authorized to plan in the area surrounding the airport and it's perfectly appropriate for FAA to choose that planning agency as the agencies to whose plans it would look to make its consistency determination. As has it been its consistent construction of the statute for the decades this statute has been in place and has been affirmed by every court that's looked at it. On the question that consumed most of the argument time about the back and forth between the EPA and FAA, I do think it's important that we start with the premise that FAA is performing the NEPA analysis and it is FAA's decision that is on review here. And as all the cases that have looked at it and as Mr. McFadden pointed out, courts defer to the FAA's decision as they do to any agency decision under the APA. As a commenting agency, EPA's comments are afforded attention. But in case after case, the courts affirm that the obligation of the FAA in this case is to review, consider, and respond to those comments. Is there any conclusion that we should draw from timing here? There's a response on December 28 from the EPA which is not particularly laudatory to the FAA. It sort of says, as we talked about earlier, in effect, why aren't you people listening to us? And I think it's the next day that a rule of decision comes out. Pretty dang quick we get a rod. Well, there's several layers of the timing problem, and let me work backwards to start with your point. I mean, first of all, the FAIS had come out almost three months before in the fall. And under the streamlining agreement that all the agencies had entered into, the promise was that FAA would issue its rod three months after the FAIS came out. So they were up against a deadline. And EPA is submitting these comments literally at the last minute. So FAA's response is terse as written in order to meet the deadline that was before it. But to roll it back, I think one of the problems that you have in this back and forth, and it goes to questions that you were asking earlier, Judge Jordan, the protocol had been established years before in consultation with all the agencies that laid out how the FAA was or the protocol was for the air quality, but there are agreements on the entire project, and not just on these specific aspects of the air quality analysis, but the entire analysis. And the FAA went forth and did that, and is going through, and then late in the game, with no serious comments or objections to the protocol on these issues. Now after the analysis is being done and is coming close to completion, EPA starts coming up with these comments, and you see in one of the notes, the commenting individual says, I wasn't there during the protocol, but this is how I think it should be done. Well, couldn't that be read, in fact, shouldn't it be read as a statement by EPA that, look, we don't have a problem with the protocols, we have a problem with how you're carrying them out. We just think you're engaged in what amounts to bad science. You're saying, well, we don't think there's going to be a building down wash problem, but you haven't cited a shred of evidence for that. It's just an assertion, you can't do that. Give us a piece of evidence, something to hang your assertion on. I mean, how is that inconsistent with agreeing with the protocol to start with, to say later in the process, we see what you've done with this protocol, and it appears to us that you're giving lip service to the science, you're not actually getting evidence and science together. But I think the problem is that the things that EPA was asking FAA to do were requiring them to redo the protocol. For example, doing dispersion modeling instead of the inventory analysis when none had been provided for. So they were saying, you really have to go back and start all over again. The building down wash example is another example where it's a timing problem of a different sort. That is, the specific location design of the boilers wasn't known. You couldn't do meaningful down wash analysis. That's why that is going to be done later as part of the PSD permitting process for those specific boiler units. And then there's the additional issue that the model that was agreed upon that FAA would use, when it did the down wash analysis, would only model the down wash from the pollutants, the emissions from the boilers themselves, wouldn't take into account the effect of the buildings on all the other mobile source pollutants, which are the overwhelming majority of the emissions at issue. The boilers account for between 0.1 and 0.04 percent. I guess that was part of their problem, though, right? They were saying, what are you relying on to tell us that this is de minimis, that it's minor? I mean, you're given a fact and a figure with it. I took the EPA's concern to be you're making assertions without evidence. No, there wasn't. I didn't understand the comments to be questioning the inventory or the calculation of the base amount of emissions from the project. The modeling issue has to do with how those are calculated. The dispersion issue has to do with how you assess how those emissions move through the atmosphere, after they've been tallied up initially. And I didn't understand the comments to be questioning the source amount of emissions, but rather what happens to them after they're released into the atmosphere. Well, not to belabor it, but the December 28 response to the FAA seemed to assert that, and the person writing it said, I have previously stated the only justifiable reason for not considering a quantifiable effect on pollutant dispersion, such as building downwash, is if it can be shown that to not account for the effect would result in a conservative estimate. This is certainly not the case for stationary source emissions that are affected by building downwash. In other words, this person seems to be saying, you've made an assertion that this is not going to be a big deal. We're giving you a conservative estimate. Relax. And the person writing this from the EPA seems to be saying, I don't know what you're relying on to say that. And my understanding of that is simply that he wanted to see what the effects of the modeling would be, and FAA's response was in the context of this project and what we're trying to study here, the overall emissions effects of the entire CEP, that would not be meaningful, give you as meaningful answers, and that specific question, the small, the detailed effects of those buildings on emissions, will be studied in connection with the permits for those buildings, which can address mitigation and other issues at that time. So is the real answer here that when the FAA says, in effect, sit down, relax, we'll get to you on this, that that is a reason which deserves our deference under an arbitrary and capricious standard, more than the deference due to the EPA when it says what it said, when it quoted. In this context, it is, because it is the FAA's decision in a legal term as well as a practical term. It's their project approval. It's their record of decision. It's their NEPA determination, NEPA document. And the question is, on the pragmatic view of whether the document as a whole is providing the information it needs, FAA needs, to make an informed decision and to inform the public about the overall magnitude of the impacts, was that sufficient? And the answer is yes. Again, you know, you can quibble with the numbers to some extent, but on the building downwash, we're talking about extremely minor numbers in the overall context of this project and on an absolute level. I see I'm out of time. If there are more questions. Thank you very much. Thank you. Ms. Lichtman. Oh, where shall I begin? I'll begin with the DVRPC. Let me ask you if you would deal with the issue of whether the project is reasonably consistent with existing plans of public agencies. It would seem that the public agency here is the Delaware Valley Regional Planning Commission. And I don't see how it can be Delaware County or Chinicum in this context. Because the statute says that the plans have to be reasonably, actually it's not reasonably, the plans have to be consistent with the plans of jurisdictions authorized by the State of Pennsylvania, in this case, to plan for the area surrounding the airport. The authorized by the State of Pennsylvania is the critical language. And isn't that the Delaware Valley Regional Planning Commission? No, it is not, Your Honor. And here's why. The Delaware Valley Regional Planning Commission is an advisory agency. In fact, it specifically abrogates all power to plan within jurisdictions. If I may quote from the compact, Article III, Section 2, which is in your record as well, the commission shall serve as an advisory agency with actual authority for carrying out planning, continuing to rest in the governing bodies of the states and counties. Look, how do you distinguish the 73 Pennsylvania Statutes, Section 701, which I thought designated the DVRPC as the Regional Planning Commission for the Delaware Valley Urban Area, and that urban area includes the City of Chinicum? Which says it is an advisory agency. That's what that section says, 73PS, Section 701, and that's echoed in Article III, Section 2. Even though it doesn't have authority to implement plans, you're not contesting, are you, that it doesn't actually produce plans? I mean, that's what it does, right? And under a compact developed between the State of New Jersey and the State of Pennsylvania and authorized by, for our purposes, relevantly, the legislature of the Commonwealth of Pennsylvania, this thing exists, and it exists to plan, even though it doesn't have authority to zone and to enforce. It plans, doesn't it? For regional transportation projects, yes. Period. Isn't the existence or expansion of an airfield pertinent to regional transportation? Yes, and if they want to plan for the airfield, that's their business, but it's the area surrounding the airfield that is relevant. And if I may also read you something, the commission shall have the responsibility of providing for the needs of highway and transportation departments. Fine. The commission shall also have the responsibility of providing for regional planning and the meeting and satisfaction of regional transportation planning. The commission shall cooperate, however, with all other state and local government agencies that have planning needs in the area. The commission shall serve as an advisory agency with actual authority, et cetera, et cetera. We already read that. The respondents submitted in their request for judicial notice, Exhibit C, a document which says, in pertinent part, DVRPC may develop plans of a regional nature. Quote, as an interstate, intercounty, and intercity agency, DVRPC advises on regional policy and capital funding issues concerning transportation, economic development, the environment, and land use. All it does is advise. Here's what I'm guessing Mr. McFadden would say if he were at that podium with you right now, is that that's who we would logically have to look to, because otherwise you would be doing just what the Eighth Circuit in Bridgeston said you can't do, which is give a veto to a neighboring community. Because if you looked to each individual neighboring township, there's likely to be somebody upset with the way the runway is expanding, because it's taking their land or it's increasing the traffic over their particular township. And so if you don't look to a regional body and you look to individual bodies, you could never move forward. What's the response to that kind of practical argument it's making, and the Bridgeston decision? The answer is this, that if you read the word reasonably into the statute, as Mr. McFadden has argued, it should be read, even though it was deleted for reasons of surplusage. If you read that, then you realize that there is no veto. What there is is a reasonable consideration, which is what is mandated, of the plans of communities surrounding airports. If you don't do that, if you only look at the regional plans for an agency like DVRPC that is mandated to plan for regional transportation projects, you're talking to yourself. You're not talking to the jurisdictions with authority to plan for the areas surrounding the airport. And really... Wait a minute. That's...Tinicum and Delaware County are not public agencies whose plans carry weight with the respective federal aviation planning, are they? Of course. They're public agencies? Delaware County and Tinicum Township? I mean, public agencies whose plans carry weight. Of course. They are the planning. Under the Pennsylvania planning statutes, they are the only jurisdictions with the ability to plan. Give me a cite then that says that they are the only planning agencies who have weight with the federal aviation planning. When you say have weight with the federal aviation... The party that seems that way is the Delaware Valley Planning Regional Planning Commission. Right. And I think... I thought that it was either Delaware County or Tinicum, probably Delaware County, they have representation on that planning commission, do they not? As far as I know. And so that's how they would weigh in. But I don't understand why Bridgeton... Bridgeton is wrong, isn't it? Yeah. Not in this case. If you give... Basically what Bridgeton is saying is you can't give one community or a couple of communities veto. Because if you did that, you'll never get 100% approval of any project, and you won't have anything built. And we are not giving a veto, Your Honor. All we are saying is that under the Pennsylvania planning statute, the way 49 U.S.C. 47106, or sorry, AAA, A-A-I-A is written, one has to give consideration to the plans of the jurisdictions authorized by the state of Pennsylvania to plan for the areas surrounding the airport. In this case, that happens to be the city of Philadelphia and the township of Tinicum. Why doesn't the fact that Delaware County has representation on the DVRPC make that an appropriate way of taking into account Delaware County and hence Tinicum's concerns? Because Delaware County is not authorized to plan within the township of Tinicum, and if Tinicum township had representation, we might have an issue. Well, the counties in Pennsylvania have planning functions. Each county has a planning agency. Only in the unincorporated areas, Your Honor. In this case, Tinicum is an incorporated area and therefore plans for itself.  I believe it is, sir. But I can do a supplemental, if you like, on that issue. I don't think it's going to be dispositive, but they do. My experience is that all the counties have planning agencies. If you would like, I can find the section that says that counties are charged with planning in unincorporated areas. And since Tinicum township is a separate jurisdiction and has a planning function within itself. Well, each township, I mean, major townships certainly have planning functions as well, and boroughs and cities, and they certainly have the ultimate zoning authority on these matters. But Delaware is an unincorporated area. So we would submit respectfully to you that the DVRPC is not the proper agency and that giving that authority to where it was intended to go, that agency that was charged with planning in that jurisdiction, is not going to create a veto, is going to create dialogue, which currently doesn't exist and was certainly the intent of the statute 47106, to discuss, at least have a discussion between these jurisdictions to decide. But it is not a veto. It is reasonably. And if I may just weigh in on a couple of the other points, the issue of deference, Mr. McFadden talks about some of the other cases that were cited, which he holds to be dispositive of the issue that the FAA, because it created the FEIS,  the cases cited by Mr. McFadden, such as citizens, the Burlington v. Busey case, all those cases and the one cited by Tinicum, have to do with challenges to agencies that rightfully deserve the deference. In that case, Burlington, the FAA was challenged on its noise analysis. Well, we do not dispute that the FAA gets total deference in the determination of noise impacts from airports, operational impacts from airports, and so on. And that was the challenge in Busey. And similarly, down the line in all the cases referred to by Mr. McFadden and cited by the respondents, those challenges were not by the agency to whom the charge of creating the statute and the regulation was delegated. And that is the EPA. Are you saying that the FAA's got no responsibility for administering NEPA when it's dealing with the CEPA when it's looking at working up an environmental impact statement? Aren't they the agency that's got the responsibility to see that that's carried out properly? Oh, you have to parse this into two sections. One is the administrative responsibility for getting it done. The answer is yes. Two is the responsibility for doing an adequate and valuatory job. There are certain areas, as I just mentioned, such as noise and some others, in which the FAA gets deference because it is the agency charged by Congress with carrying out the statute and implementing the regulations. That is not the case with clean air. In this case, the EPA should get the deference. And in this case, the FAA should be listening to what it says. And I would also point out, Your Honor, that the FAA agreed to listen. In the protocol upon which respondents rely so heavily, the FAA agreed to comply with the GAQM, the Guideline on Air Quality Modeling. They agreed six times and didn't apparently do so. And one last point, and I will not belabor you anymore. The things that Mr. Pilsk, the answers that he gave, they were very interesting, but they don't come from the administrative record. The arguments that were made in the city's brief concerning the reasoning behind the analyses and the decisions made by the FAA, they're never cited to the record. They're cited to certain sections of the regulations, et cetera, but not to the record because the FAA never said those things and notably didn't say them in their brief here either. Thank you for your patience and your time. Thank you very much. The case was very well argued. The briefs were very well done.  Can I record that, sir?